IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | * | |
| SPLIT VEIN COAL COMPANY, INC., | * | CHAPTER 11 |
|     Debtor | * | |
| | * | CASE NO. 1:03-bk-02974MDF |
| VICTOR J. KOCUR, JR., | * | |
|     Movant/Applicant | * | |
| | * | |
|     v. | * | |
| | * | |
| SPLIT VEIN COAL COMPANY, INC., | * | |
|     Objectant | * | |
| | * | |
|     v. | * | |
| | * | |
| ELWOOD SWANK, | * | |
|     Intervenor | * | |

## OPINION

Before me is the Objection of Split Vein Coal Company, Inc. ("Debtor") to the Motion for Payment of Administrative Claim ("Application") filed by Victor J. Kocur, Jr. ("Kocur") in Debtor's Chapter 11 case. The Application requests compensation and expenses totaling $103,218.82. For the reasons that follow, the Application will be approved in the reduced amount of $84,758.82.

### I. Procedural History

Debtor is a Pennsylvania corporation located in Northumberland County. Elwood Swank ("Swank") is Debtor's sole shareholder and president. Prior to the filing of its bankruptcy petition, Debtor's business activities included the recovery, reprocessing, and sale of coal refuse ("culm") recovered from lands leased for this purpose. Debtor's Chapter 11 petition was filed on May 19, 2003.

For several months in 2005 and a few weeks in 2008 and 2009, Kocur provided services to Debtor in various ways related to a fire that had burned within a culm bank (hereinafter, the Excelsior Bank) owned by Debtor near the town of Excelsior, Pennsylvania. The services provided by Kocur will be detailed in the Factual Findings, below. Debtor's culm was ultimately removed from the Excelsior Bank and sold by a third party, Gilberton Coal Company ("Gilberton"). Alleging that Gilberton had unlawfully converted its property, Debtor filed a complaint to recover the sale proceeds and was awarded the sum of $639,685 on December 11, 2009. Once the funds were received from Gilberton, Debtor's counsel made distribution to its creditors under the confirmed plan. Debtor's counsel sent the balance of the funds, approximately $207,000, to Swank.

On December 21, 2012, Kocur filed the Application now before me seeking payment from Debtor's bankruptcy estate for the services he rendered pertaining to the fire.[1] In the Application, Kocur requests compensation of $73,770 for 1229 hours worked and reimbursement of expenses totaling $29,448.82. On January 14, 2013, Debtor filed an Answer asserting various arguments for denying the Application. On January 23, 2013, Swank filed a motion to intervene in the matter, which was granted on February 5, 2013.[2]

---

[1] Pursuant to 11 U.S.C. § 1129(a)(9), administrative expenses are to be paid by a debtor in cash on the effective date of its reorganization plan. It is incumbent on a debtor to establish a bar date for filing of administrative claims and provide notice to all parties in interest of that date. In the matter before me, Debtor did not establish an administrative claims bar date. In their Briefs, neither Debtor nor Swank argue that Kocur's Application was untimely filed.

[2] Swank did not file an Answer or other pleading directly responsive to Kocur's Application.

2

A hearing on Kocur's Application was held on February 27, 2013. All three parties have filed briefs, and the matter is ready for decision.[3]

## II. Factual Findings

Kocur is a truck driver and heavy equipment operator who has been involved in the coal mining business since 1976. He is Swank's stepson. For certain periods between 1985 and 2003, he worked as a contract trucker for Debtor. In 1988 and 1989, he worked for Debtor as an employee. At the time of trial, his primary business activity was hauling coal and fly ash into and out of plants generating electricity.

In December 2005, a fire was discovered in the Excelsior Bank, and Debtor was ordered by the Pennsylvania Department of Environmental Protection ("DEP") to extinguish it. Swank worked to fight the fire himself, but was not successful. In June 2006, Kocur's mother, who at the time was married to Swank, asked him if he would assist in the fire fighting effort. After consulting with DEP officials, Kocur agreed to assist his stepfather.

On July 3, 2006, Swank and Kocur executed an agreement in which Swank purported to sell to Kocur the "refuse material from [Debtor's] breaker dumped at the Excelsior job" for a price of 25 cents a ton to be paid on a removal basis. Under the terms of the agreement, Kocur would pay Swank a royalty based on the amount of culm removed. Neither party sought court approval for the sale of Debtor's assets. Based on the recommendation of Debtor's counsel, Swank and Kocur rescinded the agreement on July 30, 2006. However, Kocur proceeded with

---

[3]I have jurisdiction to hear this matter pursuant to 28 U.S.C. §§157 and 1334. This matter is core pursuant to 28 U.S.C. §157(b)(2)(A) and (O). This Opinion constitutes findings of fact and conclusions of law required to be made by Federal Rule of Bankruptcy Procedure ("FRBP") 7052, which is applicable to contested matters pursuant to FRBP 9014.

3

plans to fight the fire. After consulting with DEP officials, Kocur determined that the best way to extinguish the fire was to remove the fuel source – the culm. The affected bank was overgrown with trees and vegetation, so he began to fight the fire by bulldozing a road into the site. Using heavy equipment,[4] he then excavated a "clay base" where burning material could be moved and doused with water. He purchased a water cannon at a cost of $8640 for this purpose. Once the clay base was established, he began digging out and moving the burning culm so that it could be saturated with water. He also moved non-burning culm to prevent it from catching fire. Between July and December 2006, Kocur spent at least 945 hours on the Excelsior Bank engaged in fighting the fire. Thomas Flannery ("Flannery"), DEP Mining and Explosives Inspector, testified that Kocur's work helped extinguish the fire and prevent additional culm from burning. Flannery further testified that Kocur's work prevented DEP from imposing fines against Debtor for failure to comply with its Order to extinguish the fire.

Kocur incurred expenses totaling $29,448.82 fighting the fire, including expenditures for the water cannon, lubricants and diesel fuel for the heavy equipment, and wages of $11.00 per hour paid to Jamie Derr ("Derr"), a heavy equipment operator. In December 2006, DEP ordered Kocur to cease his work on the Excelsior Bank because of the dispute over the ownership of the culm between Gilberton and Debtor.

At Swank's request, between December 10, 2006 and January 18, 2007 Kocur spent approximately 224 hours at or near the Excelsior Bank counting truckloads of culm that Gilberton was removing from the Excelsior Bank. Kocur's calculations of the amount of culm

---

[4]Kocur testified that the equipment he used belonged to Split Vein Trucking, an entity also owned by Swank.

4

removed were not used when damages were awarded to Debtor and against Gilberton. The Court's findings were based on the testimony and records regarding the amounts of culm that had been deposited by Debtor, not the amounts that had been removed by Gilberton.

Between December 9, 2008 and January 8, 2009, Kocur assisted Swank in preparing for the litigation between Debtor and Gilberton. Kocur also testified as a fact witness in the trial of that matter.

### III. Discussion

Section 503(b)(1)(A) of the Bankruptcy Code defines administrative expenses and provides a nonexclusive list of allowable expenses. Administrative expenses include "the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case." 11 U.S.C. § 503(b)(1)(A). In the matter before me, Kocur claims he preserved assets of the estate by saving saleable culm from burning, by preventing DEP from imposing fines against Debtor, and by assisting in the litigation against Gilberton. There is no dispute among the parties that the Gilberton litigation was Debtor's sole asset of any appreciable value and that it ultimately provided Debtor with the funds necessary to consummate its Chapter 11 Plan.

Within the Third Circuit, to constitute an administrative claim under § 503(b)(1)(A), "the debt must arise from a transaction with the debtor-in-possession and the consideration supporting the claimant's right to payment must be beneficial to the debtor-in-possession in the operation of the business." *In re O'Brien Environmental Energy, Inc.*, 181 F.3d 527, 532 (3d Cir. 1999) (citations, brackets and original ellipses omitted). "A party seeking payment of costs and fees as an administrative expense must . . . carry the heavy burden of demonstrating that the costs and

5

fees for which it seeks payment provided an actual benefit to the estate and that such costs and expenses were necessary to preserve the value of the estate assets." *Id.*

In the matter before me, there is no dispute that the services for which Kocur requests compensation and reimbursement arise from transactions with Debtor. Objectants, however, dispute Kocur's claim that his services preserved assets and provided a quantifiable benefit to the estate. Kocur's claim may be divided into two categories of services – those provided in fighting the fire and those provided in connection with the Gilberton litigation. Kocur's claims for reimbursement of expenses may be similarly categorized. Additionally, Kocur requests an award of counsel fees in the amount of $7500. I will address each category separately.

*A. Firefighting services and expenses*

Neither Debtor nor Swank dispute that Kocur spent 945 hours over the course of six months moving culm on the Excelsior Bank. They do not dispute that these efforts prevented an asset of the estate from being destroyed. They argue, however, that Kocur is not entitled to a § 503 claim because he is unable to meet his burden of proof to quantify the precise amount of culm saved. While it is correct that Kocur is unable to state the precise amount of culm preserved by his efforts, Kocur is not required to prove this fact to successfully state a claim. Objectants fail to acknowledge that Kocur moved and extinguished the fire in culm that was already ignited, thereby preventing the fire from spreading to the entire Excelsior Bank. It would be impossible for Kocur to prove how much more culm would have ignited had he not moved the burning material. By moving and extinguishing "hot spots," Kocur saved adjacent culm, even if he did not ultimately move the adjacent material. In short, the record demonstrates that Kocur's work saved an incalculable amount of estate property. It is plausible that his work

6

may have preserved all 507,116 tons of culm for the estate.[5] Thus, his efforts benefitted the estate and the only issue is the proper calculation of his reasonable compensation.

### 1. Quantum meruit recovery of compensation calculated at an hourly rate

Kocur had begun fighting the Excelsior Bank fire when the "sales agreement" with Swank was rescinded. Therefore, there was no agreement about the amount of compensation Kocur would receive for his efforts. Kocur's request for payment of hourly compensation is not based in contract but in *quantum meruit*. Under Pennsylvania law, "*quantum meruit* is an equitable remedy to provide restitution for unjust enrichment in the amount of the reasonable value of services. Where unjust enrichment is found, the law implies a contract, which requires the defendant to pay to the plaintiff the value of the benefit conferred." *In re James*, 463 B.R. 719, 726-27 (Bankr. M.D. Pa. 2011) (citations omitted). "Unjust enrichment is the retention of a benefit conferred by another, without offering compensation, in circumstances where compensation is reasonably expected, for which the beneficiary must make restitution." *American and Foreign Ins. Co. v. Jerry's Sport Center, Inc.*, 606 Pa. 584, 594 n.7, 2 A.3d 526, 532 n.7 (2010) (citing Black's Law Dictionary (8th ed. 2004)). Claims based in *quantum meruit* have been recognized by bankruptcy courts to be payable as administrative claims under § 503. See *In re Ralph Lauren Womenswear, Inc.*, 197 B.R. 771, 776 (Bankr. S.D. N.Y. 1996)

---

[5]It would also be possible to quantify the benefit provided to the estate by Kocur's firefighting by noting Flannery's testimony that, if it had not made some effort to extinguish the fire when ordered to do so by DEP, Debtor would have been subject to fines of $750 per day for thirty days, after which Debtor would also have been subject to forfeiture of its reclamation bonds. Thus, for at least the first thirty days of his work on the Excelsior Bank, Kocur benefitted the estate by saving Debtor from potential liability for fines totaling $22,500. Obviously, those fines would have constituted losses to Debtor *in addition to* the value lost through the consumption of the burning culm.

7

("indisputable" that a claimant is entitled to *quantum meruit* recovery for benefit conferred post-petition).

Again, neither Debtor nor Swank dispute Kocur's claim that he spent at least 945 hours between July and December 2006 working on the Excelsior Bank to fight the fire. As indicated above, most of this time was spent using heavy equipment to move the culm. Debtor avers that Kocur was acting purely as a volunteer and, therefore, is not entitled to any compensation for his work. This averment is readily debunked by the evidence of the "sales agreement." While the agreement was ultimately rescinded by the parties, its existence demonstrates that at the time the work was performed, neither party intended or understood that Kocur would be rendering services to Debtor on a voluntary basis.

By objecting to Kocur's Application, Debtor and Swank seek to retain the benefit of his work – the funds recovered from Gilberton – without "offering compensation, in circumstances where compensation is reasonably expected." *See American and Foreign Ins.*, 606 Pa. at 594 n.7, 2 A.3d at 532 n.7. Thus, the record before me establishes the elements of a case for a *quantum meruit* award of damages in favor of Kocur for the reasonable value of his work.

Kocur requests compensation at the rate of $60.00 per hour, which he calculated based on the rate he would have been paid in 2006 as a truck driver hauling coal – his usual employment at that time. To support his calculation, he introduced payment records from an electricity generation plan, Sunbury Generation LLC, for which he was hauling coal in the months prior to commencing his work on the Excelsior Bank. Both Debtor and Swank argue that this rate is too

8

Case 1:03-bk-02974-MDF    Doc 474    Filed 05/09/13    Entered 05/09/13 13:30:19    Desc
Main Document      Page 8 of 16

high and that Kocur is entitled to compensation at little more than minimum wage.[6] Neither Objectant, however, offered independent evidence or testimony on which to calculate a different hourly wage or otherwise rebut Kocur's evidence and the method by which he arrived at the $60.00 figure.

Generally, I found Kocur to be a credible witness. He presented uncontested evidence consisting of contemporaneous business records regarding the wages he earned operating coal transportation equipment in 2006. Based on that evidence, he demonstrated that he could have been earning approximately $60.00 per hour between July and December 2006 had he not agreed to assist Debtor by fighting the fire. He also credibly described the plan he formulated after consultation with DEP experts to fight the fire, and how he executed it. Flannery corroborated this testimony. Thus, Kocur did more than simply move piles of culm at random from place to place on the Excelsior Bank, and he is entitled to compensation at a rate that will recognize his knowledge and planning. Flannery also confirmed that the work was dangerous and the fire potentially toxic. Thus, Kocur is also entitled to compensation at a rate that will recognize the hazardous conditions under which he was working.

There was no dispute by Objectants that the fire constituted an environmental hazard that required immediate action.[4] When Debtor was ordered to undertake such action or face DEP sanctions, Swank chose to engage Kocur both to formulate the plan and to execute the hazardous

---

[6]Objectants argue that if Kocur is to be compensated for his work at an hourly rate, the rate should be the same as Kocur paid Derr, $11.00 per hour.

[4]Flannery repeated testimony from the Gilberton litigation that residents within the locality complained of the noxious fumes emanating from the fire, and feared that the ground beneath their homes could collapse as it did beneath a nearby community, Centralia, Pennsylvania, where a similar coal-related fire had burned.

9

work.  Under those circumstances, Objectants' attempts to portray Kocur's work as simply unskilled labor is inaccurate.  Without evidence from either Objectant establishing an appropriate rate of compensation, I conclude that $60.00 per hour is a reasonable rate fully supported by the record.  Accordingly, I conclude that Kocur in entitled to an administrative claim for wages in the amount of $56,730.

## 2. *Expenses*

Kocur incurred expenses in connection with fighting the fire in a total amount of $29,448.82, including expenditures for purchasing the water cannon, oil and diesel fuel, wages of $11.00 per hour for Derr, and other expenses which I will describe below.  Some of these expenses were paid by Kocur at the time they were incurred.  Other expenses were paid by a friend of Kocur's, Joe Clayman ("Clayman"), pursuant to an oral agreement under which Clayman would be reimbursed whenever Kocur received payment from Debtor.  Kocur testified that he has not yet repaid Clayman.  Swank argues that Kocur is not entitled to an administrative expense claim for the funds advanced by Clayman because Kocur has not yet paid them.  Swank cites neither language from § 503 nor case law interpreting it to support his argument.  Likewise, the Court has found no authority to support Objectant's position. Accordingly, I conclude that Kocur holds an administrative expense claim for his costs in fighting the fire even if he has not yet paid those costs.[5]

---

[5]Swank also argues that except for Kocur's own testimony, there was no proof that "the receipts and invoices presented were for supplies or equipment actually used at the Excelsior Site." (Intervenor's Brief, p. 5).  Again, the Court found Kocur's testimony to be credible, both generally and specifically regarding these expenses.  Swank did not effectively impeach his testimony nor offer evidence to rebut his claims.  Therefore I find Swank's argument to be unpersuasive.

Kocur submitted an Invoice from Stewart-Amos Equipment Co. showing that the water cannon cost $8,640 and that the bill had been paid in full. There is no dispute that the water cannon was used by Kocur and that it was necessary to fight the fire. Therefore, this expense will be allowed in the full amount.

Kocur submitted a bill for $815 for repairs to the linkage on the tracks of a bulldozer he used to move culm. There is no dispute regarding the necessity for these repairs. Therefore, that expense will also be allowed in the full amount.

Kocur documented reasonable expenses for oil and diesel fuel totaling $11,165.20.[5] There is no reasonable dispute regarding these expenses, and so they will be allowed.

Finally, there is no dispute that Kocur hired Derr as an independent contractor to help him move culm on the Excelsior Bank. Neither Debtor nor Swank argue that it was not necessary to hire Derr, or that his work did not provide a benefit to the estate. Kocur introduced checks totaling $6788 paid to Derr for this work. He also testified that he paid Derr an additional $1500 in cash. Swank argues that the cash payment should not be allowed as an administrative expense without documentary evidence. While I am not persuaded that Kocur's testimony as to the cash payment is false, I am not inclined to allow an administrative expense without some form of documentary evidence or other corroborating support. Therefore, Kocur's

---

[5]The total face amount of the checks and invoices submitted into evidence by Kocur for fuel and oil is $11,528.82. The administrative claim allowed is $363.62 less than that amount due to the fact that some of Kocur's documentation relates to transactions that fall outside of the July – December 2006 time frame when he was working on the Excelsior Bank. Specifically, an invoice for $32.25 for oil from Miller's Gas & Oil, Inc. is dated February 22, 2006 – several months before Kocur commenced firefighting work on the Excelsior Bank. Similarly, a check written to "Keystone Fuel" for $331.37 is dated December 27, 2006. Kocur's testimony and evidence showed that he was no longer fighting the fire on the Excelsior Bank as of December 18, 2006.

11

administrative expense claim for his payments to Derr will be limited to $6788.

      *B. Administrative expense claim related to Gilberton litigation*

            *1. Tallying loads of culm removed from the Excelsior Bank by Gilberton*

Kocur requests compensation at $60 per hour for the 224 hours that he spent between December 10, 2006 and January 18, 2007 counting the loads of culm that Gilberton was removing from the Excelsior Bank in its effort to extinguish the fire. Again, neither Swank nor Debtor challenge Kocur's evidence and testimony regarding the number of hours expended. Nonetheless, Kocur is not entitled to compensation in any amount for the time expended, because I do not find that it helped preserve the estate or otherwise provided any benefit to it. Therefore, his request for an administrative expense of $13,440 for these efforts will be denied.

            *2. Assistance in litigation against Gilberton*

Kocur's motion requests $3600 compensation for his "services to Debtor pertaining to the pursuit of the [Gilberton] litigation, including gathering and reviewing voluminous documents, aiding in the answering of Interrogatories, attendance at Depositions taken of Movant, multiple meetings with Debtor's attorneys in Harrisburg and Scranton, and attendance at trial . . . ." Swank responds that Kocur could have been subpoenaed to testify, and if he had been subpoenaed he would not be entitled to compensation. Swank therefore concludes that Kocur is not entitled to payment of an hourly rate of compensation for his testimony. Swank also argues that Kocur has not shown as a matter of law that he is entitled to compensation for pre-trial preparation.

12

Public policy forbids compensation of fact witnesses beyond expenses incurred and the reasonable value of time lost. *Hamilton v. Gen. Motors Corp.*, 490 F.2d 223 (7th Cir. 1973). The Federal Anti-Gratuity Statute, 28 U.S.C. § 201, addresses conditions under which payments may be made to fact witnesses in federal courts. In general, it prohibits a witness from seeking or a litigant from paying "anything of value personally for or because of the [witness's] testimony . . . at [a] trial . . . ." 28 U.S.C. § 201(c)(3). However, it carves out an exception for "the payment or receipt of witness fees provided by law, or the payment . . . of the reasonable cost of travel and subsistence incurred and the reasonable value of time lost in attendance at . . . trial." 28 U.S.C. § 201(d). *Consolidated Rail Corp. v. CSX Transp., Inc.*, No. 09-cv-10179, 2012 WL 511572, *8 (E.D. Mich.). "This exception also extends to the time that a witness spends reviewing documents and meeting with attorneys." *Id.*. See also *Centennial Management Services, Inc. v. Axa Re Vie*, 193 F.R.D. 671, 682 (D. Kan. 2000) (Anti-Gratuity statute not violated by paying a fact witness reasonable compensation for time spent in document review or depositions).

"What is a reasonable amount is relatively easy to determine in situations where the witness can demonstrate to the lawyer that he has sustained a direct loss of income because of his time away from work—as, for example, loss of hourly wages or professional fees." *Prasad v. MML Investors Services, Inc.*, No. 04 Civ. 380 (RWS), 2004 WL 1151735, *7 (S.D. N.Y.) (quoting ABA Ethics Op. 96-402).

In the matter before me, Kocur seeks compensation totaling $3240 for fifty-four hours of time he claims to have expended in assisting Debtor in the Gilberton litigation. To support his claim, he submitted a document dated December 14, 2012 addressed to Debtor and reading as follows:

13

Hours not recorded from January 19, 2006 to trial date February 11, 2009:

    1. 6 Hours    Removed Split Veins [sic] Equipment [sic] from Seedco property to Split Vein property.

    2. 8 Hours    Interrogatories

    3. 8 Hours    Visit to Attorney Cerrillo for Deposition.

    4. 3 Hours    Supplying Attorney Franks [sic] with what was needed for trial (Motion for temporary Injunctions) [sic].

    5. 3 Hours    Supplying Attorney Gromelski and Attorney Reihmer with what was needed for Trial.

    6. 16 Hours    Trips to Scranton Pa to their office.

    7. 16 Hours    Two day trail [sic] February 11 & 12, 2009.

60 Hours @ $60 = $3,600.00

(Petitioner's Exhibit 14). In his testimony, Kocur authenticated Exhibit 14 as having been drafted by him, but otherwise provided no details (e.g. the dates on which he performed these services) to substantiate his claim. Dated over three years after the time period addressed in Exhibit 14, the Exhibit obviously was not a contemporaneous business record. It was prepared by Kocur for purposes of supporting the instant claim. Thus, it is not a business record on which a factual finding might be based. *See Messer v. Board of Educ. of City of New York*, No 01-CV-6129 (JFB)(CLP), 2007 WL 136027, *7 n.11 (E.D. N.Y.) ("well-settled that evidence 'prepared or compiled for use in litigation [is] not admissible as business records.'") (citing *Potamkin Cadillac Corp. v. B.R.I. Coverage Corp.,* 38 F.3d 627, 632 (2d Cir. 1994)). *See also In re Hechinger Liquidation Trust*, 298 B.R. 240 (Bankr. D. Del. 2003); *Scheerer v. Hardee's Food Systems, Inc.*, 92 F.3d 702, 706 (8th Cir. 1996). Moreover, Kocur's request for compensation at $60 per hour apparently is based on the same rates used for his fire fighting work on the Excelsior Bank. Kocur provided no testimony whatsoever as to his employment or earnings in

14

the days and weeks leading up to the trial. Thus, there is no evidence that he "sustained a direct loss of income because of his time away from work" as the Anti-Gratuity statute would require. *See Prasad*, 2004 WL 1151735, *7. Therefore, Kocur's request for an administrative expense claim in the amount of $3600 for time expended assisting in the Gilberton litigation will be denied.[6]

A fact witness in a federal court may be compensated $40.00 per day for each day of attendance at trial. 28 U.S.C. § 1821(b). The notes of testimony from the Gilberton trial show that Kocur was present in court and testified as a witness on February 11 and 12, 2009. Accordingly, Kocur will be allowed an administrative claim for $80.00.[7]

### 3. Counsel fees

Kocur requests reimbursement from the estate of counsel fees that he incurred in pursuing his administrative claim. He cites no provision of the Bankruptcy Code to support his request, but argues that they are payable because they were part of his costs. Clearly the services of his counsel provided no benefit to the estate. Therefore, his fees are not payable as an administrate claim under § 503.

---

[6] Kocur's claim of $360 for six hours expended in moving Debtor's equipment will also be denied as there is no evidence that this work provided a benefit to the estate in the form of preserving culm or assisting in the Gilberton litigation.

[7] Under 28 U.S.C. § 1821(c) and (d), Kocur may be reimbursed for mileage to and from the trial, plus a subsistence allowance in an amount determined according to whether or not he was required to stay overnight. Kocur did not document his mileage or request a subsistence allowance. Therefore, none will be ordered to be paid as an administrative expense.

15

Case 1:03-bk-02974-MDF    Doc 474    Filed 05/09/13    Entered 05/09/13 13:30:19    Desc
Main Document    Page 15 of 16

## IV. Conclusion

For the reasons discussed above, Kocur will be allowed an administrative claim in the amount of $84,758.82.  An appropriate Order will be entered.

By the Court,

*Mary D. France*
Chief Bankruptcy Judge
(JK)

Date: May 9, 2013